**ROCOS et, Plaintiffs-Appellants, v. GAYDOS, Extrx. et, Defendants-Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 24815.   Decided October 22, 1959.

Morley, Stickle, Keeley & Murphy, Andrew Pangrace, for plaintiffs-appellants.

George E. Fedor, for defendants-appellees.

**OPINION**

By SKEEL, J.

This appeal comes to this court on questions of law and fact.   The decree of the trial court was for the defendants.   The issues of fact are

presented upon the amended petition of the plaintiffs and the joint answer to the amended petition filed by the defendants.

The plaintiffs are Mary Lestock, a daughter of George Antolik, Sr. (now deceased), said daughter being an incompetent person here represented by her guardian (husband), the remaining plaintiffs being the three daughters of the said incompetent. The defendants, George Antolik, Jr., and Elizabeth Gaydos, are the remaining children of George Antolik, Sr., who was eighty-one years of age at the time of his death, July 22, 1955.

The amended petition alleges that George Antolik, Sr., executed a will ten days after his wife's death on March 31, 1955, by which he divided his property equally among his three children, the share of his incompetent daughter, Mary Lestock, to be held in trust for her until she is restored to mental health, or if such event does not occur before her death, then such share to be given upon her death to her daughters who are herein named as plaintiffs, share and share alike.

It is alleged that the wife of George Antolik, Sr., died on March 31, 1955. Further, that during the lifetime of George Antolik, Sr., and his wife, Lizzie Antolik, they were the owners, among other property, of two joint and survivor savings accounts, one in the Society for Savings main office, with a balance of $16,695.67 on the date of the death of Lizzie Antolik, and the other account in the Madison Branch of the Cleveland Trust Company, then having a balance of $2504.71. They also owned the two family house in which they occupied the first floor, located on Ridgewood Drive in Lakewood, having an appraisal value of $23,500.

It is alleged that on the day following the day of the death of George Antolik's wife, that is on April 1, 1955, the bank account in the Cleveland Trust Company was closed and a new account was opened by the deposit of the money withdrawn from the Cleveland Trust Company in a joint and survivor account in the Home Federal Savings and Loan Association in the names of George Antolik, Sr., and the defendants, George Antolik, Jr., and Elizabeth Gaydos. On the same day, the joint and survivor account of George Antolik, Sr., and his deceased wife in the Society for Savings was closed out by opening a new joint and survivor account in the names of George Antolik, Jr., and Elizabeth Gaydos in the Society for Savings and the balance of the account of $8,000 was delivered by the bank to George Antolik, Sr., $4,000 in cash (one hundred dollar bills) and $4,000 in a bank check payable to George Antolik, Sr. On April 5, 1955, this check was deposited to the joint and survivor account above set out in the Home Federal Savings and Loan Association, making the balance on deposit in that account on that date $6504.71.

It is alleged that upon the death of George Antolik, Sr. (who had been appointed executor of his wife's estate under her will) the defendant, Elizabeth Gaydos, who was appointed executrix of her father's estate, also became the executrix of her mother's estate d. b. n. with will annexed, and as executrix of her father's estate, did not list as an asset of his estate the four thousand dollars, wherefore it is alleged that the defendants divided this money into equal shares and took it for

their own purposes. It is also alleged that after the death of their father, July 22, 1955, the defendants withdrew, for their own purposes, and in equal shares, the money in the Home Federal Savings and Loan Association in the sum of $6553.49, which included the dividend since the deposit was made, and the $8782.62 in the Society for Savings, which included accrued interest, making a total taken from the two accounts of $15,336.11, this in addition to the four thousand dollars not accounted for as assets of George Antolik, Sr.'s estate of over $19,000 in all. It is also stated that as executrix of her father's estate, Elizabeth Gaydos has made no claim for any part of the money taken from her father's accounts as assets of his estate.

It is also alleged that the decedent, George Antolik, Sr., died of cerebral arteriosclerosis, required medical attention, was finally put in a sanitarium where he died; that because of the decedent's infirmity and the reduced activity of his mind at eighty-one years of age, he was not a free agent to act for himself and was easily susceptible to influence and appeals to emotion. It is alleged that the defendants, Elizabeth Gaydos and George Antolik, Jr., used undue influence and overpowering persuasion to induce the decedent to give up control or to surrender legal control of all of the money in his bank accounts so as to defeat the rights of their sister, an incompetent, to have her equal share in her father's estate.

The plaintiffs pray for a declaratory judgment requiring the defendants to account to the estate of their father for the funds taken by them by undue influence, fraud and in breach of the confidential relation they held with their father because of his age, dependency and condition of mind under all the circumstances on the day after the loss of his wife, that being the day when he was unlawfully induced to surrender legal control of his accounts.

The defendants admit all the allegations concerning the transactions dealing with the bank accounts of George Antolik, Sr., and the withdrawal of all of the funds then remaining in the bank after the date of his death. The answer suggests a correction of the date the four thousand dollar bank check of the Society for Savings was deposited in the Home Federal Savings and Loan Association. Admittedly the plaintiffs' petition was in error one day as to the date of this deposit.

The answer then denies all the remaining allegations of the petition which in legal effect is to deny that the decedent was mentally incompetent on or about April 1, 1955, or that undue influence was used to induce him to give up control of his bank accounts. There is no claim or affirmative allegation in the defendants' answer that the monies they admittedly took out of the accounts of the decedent prior to and after his death were, in fact, gifts.

There is no controversy but that the bank accounts totaling some nineteen thousand dollars (all of the liquid assets of George Antolik, Sr that the record discloses, which he had under his complete control on March 31. 1955. the day his wife died) were transferred on the following day (April 1, 1955), either to the complete possession of the defendants or put under their legal control with the exception of the

$4,000 bank check which was deposited to the joint and survivor account in the Home Federal Savings and Loan Association four days later. The issues to be determined are first, the mental capacity of George Antolik, Sr., on April 1, 1955, to dispose of his money in the way it was, if, in fact, he proposed such disposition, and second, whether such disposition of the money was accomplished by undue influence under all the surrounding circumstances.

A careful examination of the evidence submitted discloses that George Antolik, Sr., had been a car washer for the Cleveland Transit System (and its predecessor) for many years. He retired in the early 1940's the exact date not being known to the defendants. The Society for Savings account was started in 1924 with a deposit of two hundred dollars and from that day until June 12, 1951, carried balances never exceeding $2700. On that day, $12,700 was deposited, which was unquestionably the proceeds of the sale of a house of George and Lizzie Antolik to Frank Stepka. The deposit of the money was in their joint and survivor account with no indication whether the money was that of the husband or the wife. There is sound authority that as between husband and wife, money in a joint account is presumed to be owned equally, where, as here, it is clear that such money was not derived from the wages of the husband and there is no explanation as to the basis of the account other than the contract with the bank. There can be no doubt but that Elizabeth Gaydos knew all about the savings accounts of her father and mother when she filed her inventory and appraisement and request to fix inheritance tax. At no point in the probate proceedings did she mention the apparent possibility that the estate of her mother had any interest in the funds in the account from which she had received personal benefits.

Before giving consideration to the primary questions presented, some parts of the evidence will be pointed out to determine the credit the court should give to the testimony of some of the witnesses.

The attitude of the witness and defendant George Antolik, Jr., toward his father is shown by the following: After testifying to the fact that in 1949 he borrowed $4500 from his father with which to purchase a house which he said he paid back and was not indebted to his father at the time of his father's death:

"Q. Did they loan you any other sums of money?

"A. Sure, they loaned me money for a car.

"Q. And did you repay them?

"A. I certainly did.

"Q. So you say that at the time of the death of your mother, you did not owe your father or mother any sums of money?

"A. No; I didn't.

"Q. Well, did your father make you pay interest on the money?

"A. Certainly did not. What is a father for if he doesn't help out his son?"

This same witness was called on cross-examination where, after explaining that after lunch on the day of his mother's death (April 1, 1955), his father said: "he wanted to take care of things." "He wanted

me to drive him to the Cleveland Trust Bank on Madison. He (the father) did not tell me what he wanted to do." The witness drove his father and sister to the bank where his father went to the teller by himself explaining that he and his sister "stood by the door." "We didn't even come close to him." His father got a check for $2504.71, closing out the account which the witness testified he put in his pocket. The witness then said his father wanted to go to the Society for Savings so he drove by his house, picked up his wife and went to the Society for Savings, where his sister, his wife and the witness "stood at the side" while his father transacted his business with the teller. The business at hand was closing the joint and survivor account of George Antolik, Sr., and his wife who had died the day before. The account had a balance of $16,695.67, $8,695.67 of which was redeposited in a joint and survivor account in the name of the defendants who signed signature cards as owners of the new account. The manner of the withdrawal of the balance of the account was well known to the witness even though it took place before he or his sister were called over to the desk, where new accounts were received, for the purpose of signing the necessary signature cards. The father received $4,000 in cash (one hundred dollar bills) and a bank check for $4,000. This witness then testified that on the way home they stopped at the Home Federal Savings and Loan Association, where his father deposited the $2504.71 he received from the Cleveland Trust Company and the $4,000 delivered to him from the Society for Savings when he said "All told, there was $6,000 plus." He then testified he dropped his wife off at home to get supper on the way to his sister's house where his father gave the defendants $2,000 each and delivered to them the joint and survivor savings account passbook for the $8695.67 deposit made at the Society for Savings in the name of these defendants.

At a deposition taken in October 1956, this defendant admitted he testified under oath that the amount of cash his father withdrew from the joint and survivor savings account of his father and mother was $5,000 (fifty one hundred dollars bills) and that he gave the money to his sister and himself in the bank, his sister placing her share in her pocketbook and he placing his share in his pocket while in the bank.

Elizabeth Gaydos, the defendant herein, and sister of George Antolik, Jr., testified that her father was taken, at his request, after lunch, on April 1, 1955, to the Cleveland Trust Company on Madison Avenue, where he closed out his joint and survivor account belonging to himself and deceased wife, the balance being $2504.71. The visit was made because he said "Well, we have to get that all in order. I told you I want to get everything in order." Before that he had said on the morning of April 1st, "Look how fast mother went. So I want to get everything in order." That after closing the account at the Cleveland Trust Company, her father wanted to go and was taken across the street to the Home Federal Savings and Loan Association and there a new joint and survivor account was opened in his name and the name of each of the defendants, George Antolik, Jr., and Elizabeth Gaydos. At the Home Federal, when informed by her father that he wanted the account opened in the

names of these two defendants, she said: "and I asked him, I begged him, I says Pop have your name on it," which was in fact done.

From the Home Federal Savings and Loan Association, they picked up Laura (wife of George Antolik, Jr.,) then drove to the Society for Savings, this witness testifying that they all stayed to the side while her father transacted the business of closing out the joint and survivor account in his and his deceased wife's names in a total amount of $16,695.67. This witness also testified she then found out for the first time what her father and mother's accounts were so there can be no doubt but from that day on she was fully informed of all the bank accounts of her father and mother.

At the Society for Savings, in redepositing $8659.67 in a joint and survivor savings account in the names of this witness and her brother, when asked about her suggestion that her father's name be included as was done at the Home Federal Savings & Loan Association, she testified: "He did not want it but the feeling of his was that he doesn't want. He wants just the two of us to have it. He says 'that is sister and brother.' He didn't want to sign." When asked why he withdrew $4,000 in cash, she testified: "Well, it wasn't my business. He was doing it." She also testified that they then went home from the Society for Savings where he took the $4,000 out of his pocket and gave $2,000 to her and $2,000 to her brother and handed them the savings account book evidencing the new deposit of $8659.67 in a joint and survivor account in her name and that of her brother. In attempting to explain the inconsistency between her testimony with that of her brother about the stop at the Home Federal Savings & Loan Association, she said: "After leaving the Cleveland Trust Company, we went right across the street to the Home Federal. * * * Yes, he is all balled up. He is balled up."

By the transcript on a motion excepting to the inventory of George Antolik, Sr.'s estate, the defendant is shown to have testified as follows: (The question was put to George Fedor, counsel for the defendants.)

"Q. You will recall at the end of the hearing in the Probate Court Judge Kinder asked Elizabeth if there was anything like a $16,800 account and she said she did not know of any.

"A. Gee, I don't recall either, Mr. Pangrace.

"Q. Reading from the transcript of testimony taken in probate court, exceptions to the inventory, you will recall on page 33 of that transcript that the court said:

"Alright. Was there any bank book that you know of that had $16,800 in it.

"And the witness who was Elizabeth Gaydos at the time replied, 'No, I don't know of any.'"

There is no controversy but that the transcript was read correctly.

The record before us shows the following stipulation:

"The record will show by agreement of the parties that all of the proceedings in the probate court in the estate of George Antolik, Sr., and Lizzie Antolik, his wife, might be by stipulation included in the evidence and in the record in this case."

It should be noticed that Elizabeth Gaydos did not take the stand

in her own case after testifying in the plaintiffs' case on cross-examination.

The wife of George Antolik, Jr., Laura Antolik, also testified for the defendants. She was a very positive witness. Her stock answer was "certainly yes" or "certainly no" or just "certainly." After considerable testimony about her professional status as a registered nurse, how she moved into the house with the senior Antoliks and her opinion of his mental status when examination approached the visits to the banks, this witness volunteered in answer to a question as to the purpose of the visit to the Society for Savings, the following:

"A. I was in regard—Mr. Fedor. I have to be exact about this. I want you to understand I was a daughter-in-law and I had nothing to do with any of the transactions that went on between my father-in-law and my sister-in-law and my husband."

She joined in this respect the effort of the defendants to make out that they were always at a distance and did not know what was going on during each occasion George Antolik, Sr., was at the teller's cage withdrawing money for their benefit. This is also the witness that testified in a very positive way that the visit to the Society for Savings was at 11 to 11:30 in the morning on April 1, 1955. On this question she was very positive. All others said the visit was after lunch.

The record evidence shows that in 1942, Lizzie Antolik made a will in which she gave her entire estate to her husband. The inventory of her estate shows that she held a one-half interest in the family residence. It is also evident from the manner in which this family handled all of their financial affairs that the house George Antolik, Sr., and Lizzie Antolik sold to Frank Stepka and wife was held jointly by them as were all the bank accounts so that the deposit of $12,700 in 1951 to the joint and survivor savings account of George Antolik, Sr., and his wife, Lizzie, at the Society for Savings received from the sale of the house in that year, was her money as well as his.

The evidence of influence in securing an alleged gift of over $19,000 (all of his liquid assets) from George Antolik, Sr., the day after his wife died, he then being about eighty-one years of age, when considered in the light of the complicated manner in which the several transactions were carried out, is to be found in considering the credibility of the defendants and at least one other witness called by them. The direct contradictions between them on facts about which there could be no dispute and could not result from a faulty memory makes it impossible for this court to give any credence whatever to their most unusual story.

How could George Antolik, Jr., dismiss from his memory or be mistaken as to the place where he received such a large sum of money or be in error as to the deposits made at the Home Federal Savings and Loan Association if he were actually reciting a personal experience? The same question could be asked of Mrs. Elizabeth Gaydos as to her answers concerning her knowledge of an $18,000 account of her father when she was then in actual possession of a large part of it. The record shows that both defendants accompanied their father to the banks where all of the transactions took place, including the execution of the will on

April 11, 1955. If all George Antolik, Sr., wanted was transportation, it would not have been necessary for both of the beneficiaries of the claimed gifts to escort him to the banks only to stand completely aside while he was transacting his business, particularly where all the claimed gifts were withheld until all of the parties returned to the home of Elizabeth Gaydos.

The record also discloses circumstances supporting the plaintiffs' claim of undue influence. The granddaughter recounted the statements of her grandfather after the funeral in reference to his empty pocketbook. She testified that he said several times while holding out an empty pocketbook "there was something in it—now it is gone."

One of the witnesses called by the defendant (a friend of long standing) testified that at the funeral parlor the evening of April 1, 1955, the day George Antolik's bank accounts were closed out, she talked with George Antolik, Sr., and the following conversation took place:

"He came by me and he said to me like this 'Oh, Stoffa, Mrs. Stoffa, I never thought I lose my mother.' He called her mother. 'I will be lost now.' And I said, No you not. You have childrens yet, and he again said to me look like this. 'She is still warm and that is trouble already on the money.'"

An examination of the probate proceedings in both estates discloses that as administratrix Elizabeth Gaydos made no mention of the bank accounts of the decedents for inheritance tax purposes. §5731.02 **(E)** **R. C.**, prior to its amendment effective 6/17/57, provided:

"(E) Whenever property is held by two or more persons jointly, so that upon the death of one of them the survivor has a right to the immediate ownership or possession and enjoyment of the whole property, the accrual of such right by the death of one of them shall be deemed a succession taxable under this section, in the same manner as if the enhanced value of the whole property belonged absolutely to the deceased person, and he had bequeathed the same to the survivor by will;"

The administratrix, Elizabeth Gaydos, filed under oath with the probate court on September 27, 1955 her "application with itemized statement for determination of inheritance tax." Under the heading "Joint and Survivorship Property," she entered under the column "actual market value," the figure "O." In the estate of her father, no application has yet been made.

In the case of **Tax Comm. v. Hutchison, 120 Oh St 361,** 166 N. E. 352, the Supreme Court said in the syllabus:

"Under the provisions of §5332 GC, 'whenever property is held by two or more persons jointly, so that upon the death of one of them the survivor or survivors have a right to the immediate ownership or possession and enjoyment of the whole property, the accrual of such right by the death of one of them shall be deemed a succession taxable' pursuant to the laws of this state, a succession tax may be imposed upon the interest of a deceased husband accruing to a wife in a joint bank account maintained by them to which both contributed which was subject to withdrawal by either during life, and in case of death of either, the balance to belong to the survivor; such tax is collectible even though

such joint bank account was created prior to the enactment of the statute providing for succession taxes, if it appear that the death of one of such joint owners was subsequent to passage of such statute."

It was clearly the duty of the adminitratrix to return the joint and survivor accounts in the name of the deceased and in that of her husband in the Cleveland Trust Company and the Society for Savings with a total balance of over $19,000. Her failure to do so is potent evidence of an attempt to withhold knowledge of such accounts and gives support to plaintiffs' claim.

One other circumstance requires consideration. As above set out, when the Cleveland Trust Company account was closed, the total balance of $2504.71 was immediately redeposited in the Home Federal Savings and Loan Association in a joint and survivor account in the names of George Antolik, Sr., George Antolik, Jr., and Elizabeth Gaydos. On the fifth of April, 1955, the four thousand dollar bank check made out to George Antolik, Sr., which he received in closing out the Society for Savings accounts, was deposited in the joint and survivor account in the Home Federal Savings and Loan Association. There is no evidence of a gift of this money. George Antolik, Sr., retained possession of the check until it was deposited as just indicated. The entire account was closed by the defendants after the death of their father.

The rule of law with regard to the ownership of joint and survivor deposits after the death of one of the co-depositors has been the subject of much litigation with varying results. Where donative intent is expressed by a depositor in favor of one whom he makes a co-depositor in a joint and survivor account, the law in Ohio is settled by the case of **Cleveland Trust Co. v. Scobie, 114 Oh St 241, 151 N. E. 373**, where the court said:

"Where a person opens a savings account in a bank to the joint credit of himself and another. payable to either, and balance at death of either payable to survivor, the authority to remain in full force until receipt by the bank from the depositor of written notice of its revocation, and the record shows that the depositor intended to transfer to the person to whom he made the account jointly payable a present joint interest therein equal to his own, and the passbook has been left in the possession of the bank for withdrawals by either party on the joint account, a joint interest is created in the right of the depositor in the deposit, and the person to whom the deposit is made payable jointly with the depositor. upon the death of the depositor, without his having revoked the authority to draw, is entitled to the balance of the account."

Also. in the case of **Rhorbacker v. Bldg. Assn. Co., 138 Oh St 273, 34 N. E. 2d 751**, the court said:

"When the relationship of creditor and debtor exists between a depositor and a financial institution, and the depositor directs the institution to withdraw a specified sum of money from her account, convert it into a certificate of deposit payable to herself or another or the survivor. and place such certificate in her pass book at the institution, all of which is done in consummation of the expressed desire and intent of the depositor, an executed contract thereby arises between the depositor and the institution creating an immediate joint and equal interest in the

certificate in the depositor and the designated person, with the attendant incident of survivorship, binding the institution to its terms. Upon the death of the depositor, the arrangement having remained undisturbed, such designated person, as the survivor, becomes the owner of the certificate and entitled to its possession and benefits, by virtue of the completed contract. Consideration passing between the depositor and the one surviving is not necessary, and full assent to the contract by such survivor may be presumed, the contract being one of advantage without burden."

The rule as thus set out would unquestionably result in the right of the defendants to the proceeds of the joint and survivor account in the Home Federal Savings and Loan Association were it not for the means used by them in inducing George Antolik, Sr., to give up his money. This account was a part of the intricate and involved circumstances surrounding all of the financial transactions of April 1, 1955, whereby the defendants were able to induce by undue influence their aged father to divest himself of every dollar of his liquid assets unless he was, in fact, permitted to keep the passbook to the Home Federal Savings and Loan Association account. The evidence is silent on this point.

Some attempt was made by the defendants to show that their father was put to considerable expense because of the mental illness of their sister, Mary. A trip to Detroit was suggested for medical examination which was said to have constituted some of the expense. No doubt the father did the best he could for his unfortunate child. The record is clear that Mary's husband has paid all of her expenses and has kept her at the State Hospital these many years without any help from her family. A long period of time has passed since the incidents referred to and April 1, 1955, therefore, it seems impossible that a father would deliberately prefer the defendants to such a large extent of his estate over the most unfortunate members of the family or her children.

One other circumstance was brought into the record and that had to do with the failing mental and physical condition of George Antolik, Sr., while there was evidence that he was mentally capable and physically fit on April 1, 1955, yet that day was the beginning of the most tragic period of his life, the loss of his wife. Their life together had been one of love and affection for fifty nine years. At a time like that, a son and daughter must be relied upon to protect their father from unconscionable acts and lend help and comfort. These defendants denied any untidy conduct on their father's part between the death of his wife and the last days of his life but it must be noticed that they put him in a sanitarium shortly before his death, not a hospital.

From all the foregoing, we can come to but one conclusion, namely, the prayer of plaintiffs' petition for a declaratory judgment should be allowed, holding that all of the withdrawals from the accounts of George Antolik, Sr., and his wife were void and directing these defendants to account to the estate of Lizzie Antolik and the estate of George Antolik, Sr., for the money withdrawn from said joint and survivor accounts of the decedents and submitting such funds to proper administration.

HURD, PJ, KOVACHY, J, concur,